**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| TYRONE JOHNS | : | NO. 08-372-01 |

DuBOIS, J.                                                      AUGUST 27, 2009

**M E M O R A N D U M**

## I.   INTRODUCTION

Defendant, Tyrone Johns, is charged in a two-count Indictment with:  (1) possession with intent to distribute five grams or more of cocaine base ("crack"), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) (Count One); and (2) possession with intent to distribute five grams or more of cocaine base ("crack") within one thousand feet of a school, in violation of 21 U.S.C. §§ 860, 841(b)(1)(B) (Count Two).

Presently before the Court is Defendant's Motion to Suppress Physical Evidence in which defendant moves to suppress the cocaine base ("crack") found on his person during a vehicle stop on November 25, 2007.  The Court held a hearing and oral argument on defendant's Motion to Suppress on July 27, 2009.  Following the hearing, on August 3, 2009, defendant requested that the Court reopen the record to receive additional evidence in support of defendant's Motion to Suppress.[1]  The Court granted the request on August 6, 2009, and defendant submitted additional records to the Court on August 19, 2009.  For the reasons set forth below, defendant's Motion to Suppress is denied.

---

[1] A copy of defendant's request by email dated August 3, 2009 shall be docketed by the Deputy Clerk.

II.    **BACKGROUND**

On the evening of November 25, 2007, defendant was driving a red 2007 Ford Mustang westbound on Cedar Avenue in Philadelphia.  (Suppression Hr'g Tr. 6, July 27, 2009.)  The Mustang was a rental vehicle that defendant had rented five days earlier.  (Id. at 36, 40.)  Police Officers Kaliv Ivy and Joseph Carter, assigned to the Philadelphia Police Department's Highway Patrol Unit, were driving westbound on Cedar Avenue in a marked police vehicle.  (Id. at 6.)  At some point east of 60th Street, they became positioned one to two car-lengths behind defendant's vehicle.  (Id. at 7, 14–15.)  What happened next is disputed by the parties.

According to P.O. Ivy, when both vehicles braked at the red light at 60th Street, the two side brake lights of defendant's Mustang worked properly, but the center rear brake light did not illuminate.  (Id. at 6–7, 15–16.)  After the light turned green, P.O. Ivy turned on the overhead lights of his police vehicle, and defendant immediately pulled over to the side of the road.  (Id. at 7–8, 16.)

Defendant testified to the contrary.  According to defendant, the Mustang's rear center brake light was fully operational.  (Id. at 37–38.)  Defendant testified that when he rented the Mustang, he and the rental agent inspected the vehicle.  (Id.)  Defendant sat inside the Mustang and depressed the brake pedal; the rental agent stood outside the vehicle to confirm that the brake lights were functioning properly.  (Id.)  At that time, five days prior to the stop, the rental agent did not mention any problems with the center rear brake light.  (Id.)  Defendant further testified that following his arrest, he was seated inside the police cruiser parked behind the Mustang, waiting for a tow truck for the Mustang.  (Id. at 38–39.)  Initially, the Mustang's engine was running while P.O. Carter went to retrieve the keys.  (Id. at 38–39, 41–43.)  Defendant testified

that during this time, the center rear light was illuminated.  (Id. at 38–39.)  P.O. Ivy could not

recall whether he said anything to defendant regarding the center rear brake light as he walked

defendant to the police vehicle and placed him inside the vehicle.  (Id. at 42–44.)

       With the exception of whether the Mustang's rear center light was illuminated during

some portion of the stop, defendant does not dispute P.O. Ivy's account of what happened after

defendant pulled over.  P.O. Ivy testified that he walked over to the driver's side of the Mustang

and shone a flashlight into the vehicle.  (Id. at 7–8.)  When he did so, he saw a plastic bag with

green plastic packets of a white, chunky substance protruding from the pocket of defendant's

"hoodie" jacket.  (Id.)  Believing that the plastic bag contained drugs, P.O. Ivy ordered defendant

out of the vehicle, seized the plastic bag, and placed defendant under arrest.  (Id. at 8.)  A

subsequent test revealed that the white substance tested positive for cocaine base ("crack").

(Property Receipt, No. 2756372, Nov. 25, 2007, Ex. G2.)  After taking defendant into custody,

P.O. Ivy determined that defendant was driving without a driver's license.  (Suppression Hr'g Tr.

9, 22.)  As defendant did not have a license, the officers conducted a "live stop," which "allows

the police to tow and seize a vehicle if the owner or operator doesn't have a valid license or if

their license is suspended. . . . [They] proceeded to live stop [defendant's] vehicle and called the

Philadelphia Parking Authority for it to be towed."  (Id. at 9.)

       P.O. Ivy issued a traffic citation to defendant for driving without a license.  (Traffic

Citation, No. W02056390, Nov. 25, 2007, Ex. G1.)  Defendant was not given a traffic citation

for driving with an inoperable rear center brake light.  (Suppression Hr'g Tr. 22–23, 31.)

However, the Traffic Citation for driving without a license mentioned that the Mustang's "high

mount brake light [was] out."  (Traffic Citation, Ex. G1.)  The Property Receipt prepared by P.O.

Ivy also stated that defendant "was stopped operating . . . [a] Red/Ford Mustang with its high mount brake light out . . . ."  (Property Receipt, Ex. G2.)  In addition, the Philadelphia Police Department Vehicle or Pedestrian Investigation Report ("Form 75-48A") mentioned "rear brake lights" and Philadelphia Code Section "4303-B," which governs rear lighting systems.  (Form 75-48A, Nov. 25, 2007, Ex. G4.)

Defendant filed a Motion to Suppress the cocaine base ("crack") on April 2, 2009.  The Court held a hearing and oral argument on defendant's Motion to Suppress on July 27, 2009. Following the hearing, on August 3, 2009, defendant requested that the Court reopen the record to receive additional evidence in support of defendant's Motion to Suppress.  On August 6, 2009, there being no objection, the Court granted defendant's request.

On August 7, 2009, defendant served a subpoena requesting "[a]ll maintenance/repair records for Hertz vehicle #01998/939940; VIN: 1ZVFT80N175358844; NJ Tag VZT65S, for the months of November & December 2007," the vehicle defendant was operating on the evening of November 25, 2007.  Carolyn Fry, on behalf of the Hertz Corporation, responded to the subpoena on August 11, 2009, attaching "all records found in our system for that vehicle on those dates." The records disclose that an oil and filter change was performed on November 8, 2007.  The records also disclose that Hertz was notified by the Parking Authority on November 26, 2007 that the vehicle had been towed and should be retrieved by Hertz.  There is no record of the replacement of any brake lights.

## III.   LEGAL STANDARD

"On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable."

United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005) (citing United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995)).  The applicable burden is proof by a preponderance of the evidence.  United States v. Matlock, 415 U.S. 164, 178 n.14 (1974).

Stopping and detaining a vehicle and its occupants is a seizure under Fourth Amendment to the United States Constitution.  Johnson, 63 F.3d at 245.  To be reasonable under the Fourth Amendment, a vehicle stop must be based on reasonable suspicion, not probable cause.  United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006).  Under Third Circuit precedent, "a traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a [correctly interpreted] traffic law at the time of the stop."  Id. at 398.  Moreover, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place."  Id.  This standard has been described as "not particularly rigorous, as no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts."  United States v. Fleetwood, 235 F. App'x 892, 895 (3d Cir. 2007) (non-precedential).

To "evaluat[e] the constitutionality of a traffic stop, a court is free to examine the sufficiency of the reasons for the stop as well as the officer's credibility."  Johnson, 63 F.3d at 247.  Under the "authorization test" adopted by the Third Circuit, "the validity of a traffic stop should be evaluated on the officer's objective legal basis for the stop . . . ."  Id.  The officer's subjective basis or pretextual reason for the stop is irrelevant provided that the officer possessed reasonable suspicion that the defendant violated a traffic law.  Id. at 247–48.

IV.     DISCUSSION

In the Motion to Suppress, defendant challenges only the initial stop of his vehicle, not the subsequent search or the seizure of the cocaine base ("crack").  Defendant raises both factual and legal challenges to the stop.  Defendant contends that the center rear brake light of the Ford Mustang was in fact operational.  In the alternative, defendant argues that driving a vehicle with an inoperable center rear brake light does not violate the Pennsylvania Motor Vehicle Code, rendering the stop unlawful.  The Court will address defendant's legal argument first and then turn to the factual dispute.

A.      The Pennsylvania Motor Vehicle Code

Chapters 41 and 43 of the Pennsylvania Consolidated Statutes establish "minimum standards for vehicle equipment the performance of which is related to vehicle safety, noise control and air quality . . . ."  75 Pa. C.S.A. § 4101.  Chapter 43 governs lighting.  It regulates rear lighting systems as follows

> Every vehicle operated: on a highway shall be equipped with a rear lighting system including, but not limited to, rear lamps, rear reflectors, stop lamps and license plate light, in conformance with regulations of the department.  If a vehicle is equipped with a centrally mounted rear stop light, a decal or overlay may be affixed to the centrally mounted rear stop light if the decal or overlay meets all applicable State and Federal regulations.

75 Pa. C.S.A. § 4303(b).

In United States v. Burks, No. 06-CR-205, 2007 WL 128005, at *6–8 (W.D. Pa. Jan. 11, 2007), aff'd, 290 F. App'x 488 (3d Cir. 2008), the court analyzed section 4303(b) and the relevant related statutes and regulations.[2]  Considering the relevant statutes and regulations as a

_____

[2] The Burks court considered, in addition to 75 Pa. C.S.A. §§ 4101 and 4303(b), the following statutes and regulations:

whole, the court held that "operating a vehicle with an inoperable factory installed rear window

center brake light violates section 4303(b) of the Pennsylvania Motor Vehicle Code . . . ." Id. at

*7.  The officers in Burks "produced specific, articulable facts that supported a reasonable

suspicion of a traffic infraction, namely, violation of section 4303(b) and department regulations

requiring all factory installed brake lights to be operational."  Id. at *8.  Accordingly, the stop

was justified by reasonable suspicion of a violation of the Motor Vehicle Code and comported

with the Fourth Amendment.  Id.

 In a non-precedential opinion, the Third Circuit affirmed the court below, holding that

---

- 75 Pa. C.S.A. § 4103(a):  The department shall promulgate vehicle equipment standards for vehicles, equipment and devices required under this part. To the maximum extent possible, consistent with safety, the standards shall be expressed in terms of minimum acceptable performance levels, measured against objective testing parameters.

- 75 Pa. C.S.A. § 4107(b)(2):  It is unlawful for any person to . . . [o]perate, or cause or permit another person to operate, on any highway in this Commonwealth any vehicle or combination which is not equipped as required under this part or under department regulations or when the driver is in violation of department regulations or the vehicle or combination is otherwise in an unsafe condition or in violation of department regulations.

- 75 Pa. C.S.A. § 6308(b):  Whenever a police officer . . . has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

- 67 Pa. Code § 175.66(e):  A vehicle specified under this subchapter shall have at least one red stop lamp on each side of rear of vehicle, which shall be illuminated immediately upon application of the service brake.

- 67 Pa. Code § 175.80(a)(9)(i) (Inspection procedure):  Check the lamps and lenses and reject if . . . [a]n exterior bulb or sealed beam, if originally equipped or installed, fails to light properly, except ornamental lights.

"the police officers correctly interpreted Pennsylvania law when they pulled over the car in which

Burks rode for having a non-operational centrally mounted rear stop light."  United States v.

Burks, 290 F. App'x 488, 491 (3d Cir. 2008) (non-precedential).  In reaching its conclusion, the

Third Circuit analyzed the statutory text of section 4303(b) as follows:

> This section [4303(b)] lists "stop lamps," which implies a minimum requirement of two
> stop lamps "[o]n the rear—1 on each side of the vertical centerline, at the same height,
> and as far apart as possible."  But the section includes the phrase "not limited to," which
> anticipates greater restrictions.  Indeed, the second quoted sentence provides such a
> restriction.  It implicitly requires that any centrally mounted rear stop light must function.
> It would not make sense to limit the permissible types of decals or overlays unless the
> section requires any centrally mounted rear stop light to function and be visible.  Limits
> on blocking a centrally mounted rear stop light would have little effect and would punish
> decal users selectively if that centrally mounted rear stop light did not have to work in the
> first place.

Id. at 490 (internal citations omitted).

　　　While the decision of the Third Circuit in Burks is not binding, the Court finds its

analysis of section 4303(b) persuasive and will adopt its conclusion, namely, that driving a

vehicle with an inoperable centrally mounted rear stop light is a violation of the Pennsylvania

Motor Vehicle Code.  Accordingly, if an officer has a reasonable belief based on "specific,

articulable facts" that the center rear brake light of a vehicle is inoperable, the "stop will be

deemed a reasonable 'seizure.'"  United States v. Delfin-Colina, 464 F.3d 392, 398 (3d Cir.

2006).

　　　In the instant case, if an "objective review of the facts" shows that the officers reasonably

believed that the center rear brake light of defendant's vehicle was inoperable, the stop was

lawful and did not violate defendant's Fourth Amendment rights.  See id.

**B.**　　**The Center Rear Brake Light of Defendant's Vehicle**

　　　As discussed in Part II, *supra*, the parties dispute whether the center rear brake light of

8

defendant's Mustang was operational at the time of the stop on November 25, 2007.  P.O. Ivy

testified that when defendant braked at 60th Street, the rear center light did not illuminate.

(Suppression Hr'g Tr. 6–7, 15–16.)  Although defendant was cited only for driving without a

license, the non-operational rear center brake light was mentioned on the Traffic Citation, the

Property Receipt, and the Form 75-48A.  With respect to the lack of a citation for driving with an

inoperable center rear brake light, P.O. Ivy testified that officers do not have to issue a citation

for every violation of the Motor Vehicle Code and that whether to issue a citation is completely

within the officer's discretion.  (Id. at 22–23, 34.)  P.O. Ivy further testified that he had never

met, seen, nor heard of defendant before the stop on November 25, 2007.  (Id. at 41.)  The

government elicited this testimony to rebut any argument that P.O. Ivy had a preexisting

motivation to stop defendant and fabricated a reason to do so.  In other words, as P.O. Ivy had no

prior knowledge of defendant, according to the government, he had no motive to falsify a

pretextual reason to stop defendant.  The Court finds this argument persuasive.

Defendant testified that the center rear brake light was fully operational, that it was

checked by the rental agent five days earlier, and that it was illuminated while he was sitting in

the police vehicle.  (Id. at 37–40.)  To impeach the credibility of P.O. Ivy, on cross examination,

defense counsel asked P.O. Ivy about the description of the rear center brake light as "high

mount" on the Traffic Citation and the Property Receipt.  (Id. at 17–19, 21.)  P.O. Ivy testified

that he would generally use the term "high mount" to describe a rear center brake light located

either at the top or the bottom of a vehicle's rear window, but not such a light located in the

center of the trunk.  (Id.)  Defense counsel showed P.O. Ivy two pictures of a 2007 Ford Mustang

found on the Internet—one picture shows the rear of the vehicle (Ex. D2(a)) and the other shows

the side of the vehicle (Ex. D2(b)).  (Suppression Hr'g Tr. 30–31.)  The vehicle in the pictures has the same Vehicle Identification Number ("VIN") as is listed on the Form 75-48A.  (Id.)  In the picture, the center rear brake light is in the center of the trunk, not in the rear window.  (Id.)  According to P.O. Ivy's testimony, he would not generally describe such a light as "high mount."  (Id. at 17–19, 21.)

Despite the inconsistency in the description of the center rear brake light and the lack of a citation related to the light, the Court finds P.O. Ivy's testimony credible.  In particular, the Court finds no evidence suggesting that P.O. Ivy had a motive to fabricate a reason to stop defendant.  The maintenance records subpoenaed by defendant from Hertz do not alter the Court's finding with respect to the credibility of P.O. Ivy's testimony.  At most, the records show that Hertz did not have the Mustang's center rear brake light repaired in the month following the stop.  The records do not establish that the brake light was working at the time of the stop.  Based on all of the evidence presented, the Court concludes that P.O. Ivy had a reasonable belief that the center rear brake light on defendant's vehicle was inoperable at the time of the stop.

P.O. Ivy's reasonable belief that the center rear brake light on defendant's Mustang was not functioning properly provided a lawful justification for the stop because a malfunctioning brake light is a violation of 75 Pa. C.S.A. § 4303(b).  Thus, the stop was a reasonable seizure and did not violate defendant's Fourth Amendment rights.  As a result, the cocaine base ("crack") was lawfully obtained by the police officers and will not be suppressed.

## V.   CONCLUSION

For all of the foregoing reasons, Defendant's Motion to Suppress Physical Evidence is denied.

10